IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |  |
|---|---|---|
| JUSTMED, INC., | ) | |
| | ) | Case No. CV 05-333-S-MHW |
| Plaintiff/Counterdefendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL BYCE, | ) | **MEMORANDUM DECISION** |
| | ) | |
| Defendant/Counterplaintiff. | ) | |
| _____ | ) | |

## INTRODUCTION

This litigation revolves around software used in a digital audio larynx device, called the "JusTalk," which helps to create a voice in laryngectomees, individuals without a larynx. The two primary promoters and developers of this device, Joel Just ("Just") and Michael Byce ("Byce"), worked on and off for a number of years in perfecting the concept and eventually a corporation was formed, JustMed, Inc. ("JustMed") to bring it to market. Just and his wife owned a majority of the shares of the corporation and Byce, along with others, owned a minority interest in JustMed. When it appeared that the device might be a landmark breakthrough in this area and could possibly be sold for several million of dollars, tension developed between Byce and Just over their respective ownership interest in the software that powered the device and in

JustMed, Inc. itself.

The simmering dispute finally reached the boiling point, when on June 13, 2005, Byce removed the computer software essential to the operation of the device from JustMed's computer systems, without the knowledge of Just.  Byce claimed that he was the owner and developer of the software and that he had developed it on his own time.  Just countered that Byce had developed the software while he was an employee of JustMed and that ownership of the software rested with JustMed.  Thus the crux of this dispute became whether Byce retained all ownership interest in the software because he was working on his own in developing the source code, as some type of independent contractor, or whether, as contended by JustMed, that Byce was an employee of JustMed and the source code was developed under the "work for hire" doctrine.

On August 9, 2005, JustMed filed this action in the District Court of the Fourth Judicial District of the State of Idaho seeking damages and injunctive relief for misappropriation of a trade secret, pursuant to Idaho Code § 48-801, *et seq*., conversion, breach of a fiduciary duty and interference with a prospective economic advantage.  On August 10, 2005, the state court issued a temporary restraining order (TRO) requiring Byce to return the software to JustMed "in full operating order."  This order was to expire in fourteen days and a hearing on the continuation of the TRO was set for August 22, 2005.  However, on August 22, 2005, Byce removed this case to federal court, asserting federal question jurisdiction under federal copyright law.  Once the case was removed, Byce answered and counterclaimed for declaratory relief under the Federal Copyright Act, 17 U.S.C. § 201 *et seq*.  Plaintiff filed a Motion for Remand which this Court denied on November 29, 2005.

On January 16, 2007, the Court began a four day court trial in this matter.  The Court has

**Memorandum Decision - Page 2**

spent a considerable amount of time reviewing the record in this case, along with the parties'

post-trial submissions and makes it Findings of Fact and Conclusions of Law as follows.

## I.
## Factual Findings

At the time the idea of a digital audio larynx was first discussed in the mid-1990's, Just

and Byce were brothers-in-law, their respective wives being sisters.  Joel Just has a bachelor's

degree in electrical engineering and has worked as a research and development manager and in

other managerial positions for several different companies.  These included established

corporations as well as new start-ups.  Michael Byce has a bachelor's degree in electrical

engineering, as well as in computer science.  He worked at Hewlett Packard for most of his

career up until 1998.  (Testimony of Michael Byce, January 16, 2007 at 11:02; Testimony of Joel

Just, January 17, 2007, at 10:47-51; Byce, January 19, 2007, at 11:00-01.)

Through his job, Just knew of an acquaintance who had made some successful

improvements to the existing artificial larynx technology.  While driving to a family outing in

June 1994, Just mentioned the artificial larynx to Byce and they began brainstorming and

discussing ideas of how to improve this technology.  At that time, the existing technology

required that the user press and hold the device against his or her throat and Just and Byce

wanted to see if it were possible to create a device that did not involve the use of a person's

hands.

Upon returning home from this vacation, Byce began investigating and evaluating

different possibilities for this idea, such as the use of ultrasound.  Byce discussed his ideas with

Just during this time.  After the ultrasound concept fell through, Byce stopped working on the

idea.

**Memorandum Decision - Page 3**

The following year, 1995, Just interviewed people involved in the artificial larynx industry and worked on a business plan.  Byce and Just also went to see a patent attorney and on October 3 of that year, they applied for a patent as co-inventors of a "system and method for monitoring the oral and nasal cavity."  The patent was ultimately issued on October 27, 1998. Between 1995 and 1998, Byce continued to do some work on the project.

At the beginning of 1998, Byce decided to quit his job at Hewlett Packard and devote his full-time efforts to developing a working prototype of the patent.  During that year, Byce developed a prototype of the artificial larynx, but it was never close to being placed in production.  In January of 1999, Byce's wife died suddenly in an accident and Byce ceased working on the artificial larynx for the next several years.  (Def's Ex. 200; Byce, Jan. 16, 2007 at 11:02-23; Just, Jan. 17, 2007, at 10:58-11:03.)

No work was performed on the digital audio larynx device between 1999 and 2003.  In early 2003, at his wife's suggestion, Just decided to devote all of his efforts towards developing a workable digital audio larynx.  He contacted an old business associate, Jerome "Jerry" Liebler ("Liebler") and the two began working on the idea.  On February 21, 2003, Joel and Ann Just decided to form a corporation,  JustMed, Inc., with its principal place of business in Beaverton, Oregon.

Due to the efforts initially put forth by that Byce on the project, and in part because of the family relationship, Just offered Byce founders' options in the corporation in equal amounts, two-thirds for Joel and Ann Just and one-third for Byce.[1]  The value was ten cents a share at the time.  Byce also agreed to accept a position on the Board of Directors with the Justs.

---

[1]  Byce exercised his options, purchasing 100,000 shares for $10,000.  Byce later invested $15,000 and purchased 30,000 shares after the share value had increased to 50 cents a share.  (Just, Jan. 17, 2007, at 4:21.)

**Memorandum Decision - Page 4**

The first employees of JustMed were the Justs and Liebler.  The employees were compensated with shares of stock instead of a cash salary.  For every hour worked, they were paid 200 shares.  Later, the hourly idea was scrapped, and Just and Liebler were paid a monthly salary, accruing 20,000 shares a month.  The company operated financially by raising capital from family members and Just himself put in $100,000.  Just kept track of the shares that people were accruing in a notebook, which he later converted to a spreadsheet on a computer.  While individuals were accruing shares of stock on a monthly basis, share certificates were not always issued to reflect their ownership interest and were only issued when requested or when there was a cash investment.  (Pla's Exs. 4, 5; Byce, Jan. 16, 2007, at 11:26; Just, Jan. 17, 2007, at 11:11-22.)

Just and Liebler worked many hours together in Liebler's basement, trying out many different ideas and building a tabletop model.  They developed a hardware prototype, wrote assembly language source code[2] and eventually developed a device that worked.  Liebler wrote the majority of the code during this time, working at his home on his own computers.  To protect the proprietary nature of the source code, copyright notices were placed in the code and it was never released outside the company.  The last version of source code that Liebler developed was called "Nice5d."  (Just, Jan. 17, 2007, at 11:12, 11:24-25; Testimony of Jerome Liebler, January 18, 2007, at 12:37-39, 1:07.)

From January 2003 to late summer of 2004, Byce continued to serve as a board member of JustMed.  He participated in board meetings and was apprised of the progress of the business.

---

[2]  Source code is the human readable text that passes through a compiler, interpreter or assembler and comes out as computer, or machine, instructions, which is known as "object code."  (Byce, Jan. 17, 2007, at 9:47-48.)

**Memorandum Decision - Page 5**

At some of these meetings, Just discussed aspects of the source code with Byce.  Byce raised some capital for the corporation by encouraging his family members to invest in the company. He also developed a webpage for JustMed in the summer of 2004.  (Byce, Jan. 16, 2007, at 11:27-28; Just, Jan. 17, 2007, at 11:27, 11:34.)

By the summer of 2004, JustMed had a marketable product, called "JusTalk," that was displayed at the International Association of Laryngectomees (IAL) conference in Anaheim, California.  The Justs and George Barron, a laryngectomee, attended this conference.  They demonstrated the JusTalk at the conference, talked with distributors, and received a commitment from one.  At least one speech pathologist was very impressed with JusTalk.

No sales were made by JustMed at the conference as selling products at the conference was prohibited.  Just testified that there were no problems with the product at the conference. Although the conference was not as well-attended as previous conferences, Just felt the product was very well received.  Byce testified differently.  Although he was not in attendance at the conference, Byce's son did attend and he told Byce that the conference was not successful and the product was not working well.  Byce also testified that Just had told him the same thing. (Byce, Jan. 17, 2007, at 9:23-24; Just, Jan. 17, 2007, at 11:26, 11:35-39; Liebler, Jan. 18, 2007, at 12:40.)

Shortly after the conference, Jerry Liebler announced that he would be moving to Kentucky.  Around the same time, Byce expressed interest in becoming more involved with JustMed and approached Just about stepping in for Liebler and working on the source code.  Just agreed that this would be a good idea and in his notebook[3] he documented this event, sometime

---

[3]  Just maintained several notebooks in which he documented dates of conversations, meetings, etc. that pertained to JustMed's business.  (Plaintiff's Exhibit 25; Just, Jan. 17, 2007, at 12:03-04, 1:50-51.)

**Memorandum Decision - Page 6**

between August 16 and September 2, 2004 with: "Mike Byce- Work for JustMed - NPI [New Product Introduction]- New Product Video." (Pla's Ex. 25; Byce, Jan. 16, 2007, at 11:33-34; Just, Jan. 17, 2007 at 11:47-48; Just, Jan. 18, 2007, at 9:58-59.)

Just testified that he told Byce that JustMed did not have money to pay him in cash so he would have to be compensated in shares and Byce agreed to that. Byce testified that he expected to be compensated with shares but had no "explicit knowledge" that he was accruing shares of stock as compensation.

At the time, Liebler was still being retained on a half-salary basis but agreed that his salary package should be transferred over to Byce. Liebler's salary of $90,000 a year, paid on a monthly basis of 15,000 shares, with the share value at 50 cents a share, was transferred to Byce.

Byce began work in September and shares were first accrued to Byce in October 2004. No share certificates were issued for this compensation. At the beginning of 2005, Just reconfirmed this salary with Byce and documented it in his notebook by noting "Mike Byce - Start $90k begin Oct. 1, for design work on JusTalk." Besides these notations, there was no written employment agreements. Byce testified that he believed once he finished the source code, he would transfer ownership of the source code to JustMed in exchange for "plenty" of compensation. (Pla's Exs. 7, 25; Byce, Jan. 16, 2007, at 11:46-47; Just, Jan. 17, 2007, at 11:15, 11:48-51, 1:57, 4:03; Just, Jan. 18, 2007, at 9:55; Byce, Jan. 19, 2007, at 11:03-04.)

JustMed did not have Byce fill out an I-9 citizenship form or a W-4 tax form. Byce was not issued a W-2 for his salary at this time either. JustMed did not pay worker's compensation insurance on the compensation paid to Byce in shares. All of these are requirements for employers under federal and state law. In JustMed's "Company Profile" brochure and on his

JustMed business card, Byce was referred to as the "Director Research and Development" and "Director of Engineering."  Despite testifying that he was not aware of a title he had in the company, the latter job title was supplied by Byce.  (Pla's Exs. 5, 6; Byce, Jan. 16, 2007, at 11:35-40, Just, Jan. 17, 2007 at 4:04-06; Testimony of Marion DeMaria, January 18, 2007, at 1:22-27.)

Prior to beginning work on the source code, Byce was provided with many materials by JustMed, including: an evaluation board, JusTalk units, a proprietary cable, schematics, data sheets, assemblers, chargers, batteries, and headsets.  He was also provided with the most recent version of source code created by Liebler.  There were many discussions between Just, Byce and Liebler to bring Byce up to speed on the source code and discuss how to go forward with the project.  (Just, Jan. 17, 2007, at 11:51-52, 1:52-53; Byce, Jan. 16, 2007, at 11:40-45; Liebler, Jan. 18, 2007, at 12:44; Pla's Ex. 25.)

In September 2004, Byce quit the job he had at the time and began working full-time on the source code.  He worked long hours from his home in Boise, Idaho, using his own computer and the other devices and tools supplied by JustMed.  Byce copied the source code file he received from JustMed, "Nice5d," and began editing it.  He eventually began designating versions of the source code he was creating, beginning with "A1," then "A2," up to version "B4" in May 2005.  Byce would email these versions of the source code to Just as he created them.  Just would download the source code, "compile" it as object code, load it on the JusTalk and then evaluate the output of the code.  Just and Byce would communicate via telephone calls and emails about the product.  Just would also makes trip to Boise, at other times they would meet

half-way between Boise and Portland, Oregon[4] and on occasion Byce would come up to Portland.  During  these meetings and conversations, Just and Byce would share ideas and discuss different concepts, the functionality of the code, what kind of improvements were needed, among other things.  Just never personally made edits to the source code.  Byce testified that the last version of the source code that he worked on was "B5," and of the 3500-4000 lines of code that it contained, approximately twenty-one (21) lines were from the "Nice5d" version worked on by Liebler.  (Pla's Exs. 25, 26; Byce, Jan. 16, 2007, at 11:00, 11:34, 11:40-51; 3:50-53; Just, Jan. 17, 2007, at 11:51-12:04, 1:34-2:00, 4:03; Just, Jan. 18, 2007, at 10:21.)

In addition to working on the source code during this time, Byce continued to update the company website, attended several conferences, marketing meetings and demonstrations, some of which took place in Texas.  (Byce, Jan. 16, 2007, at 1:32-34; Just, Jan. 17, 2007, at 2:01-02; Byce, Jan. 19, 2007, at 11:16-17; Pla's Ex. 25.)

The source code that both Liebler and Byce worked on contained a copyright statement of "Copyright © JustMed Inc. 2004."  This copyright was not registered with the U.S. Copyright Office.  Sometime towards the beginning of 2005, Byce, changed the year in the copyright statement from 2004 to 2005.  Byce testified that when he changed the year in the copyright statement, he did not know that the copyright read "JustMed, Inc.," which the Court does not find to be credible since the name is on the same line as the year.  Sometime in May 2005, Byce, without the knowledge of Just, changed the copyright statement to read "Copyright Michael Byce © 2005."  Byce made this change after he became concerned that he was being treated inequitably by Just and JustMed.  (Pla's Exs. 24, 30; Byce, Jan. 17, 2007, at 10:20-22; Just, Jan.

---

[4] JustMed is located in Beaverton, Oregon and the Justs live in Tigard, Oregon, both in the Portland area. (Just, Jan. 17, 2007, at 10:46; Pla's Ex. 5.)

18, 2007, at 9:18; Byce, Jan. 19, 2007, at 11:55-12:01.)

In the spring of 2005, JustMed was advertising to the laryngectomee community that a new version of the JusTalk software would be coming out soon. JustMed was also in talks with various distributors as well as investors, specifically one named ATOS, a Swedish corporation. Just was discussing a possible merger or buy-out with ATOS. Byce attended some of these meetings and was aware of the discussions going on between the two companies. Byce became aware that Just thought he could sell JustMed for millions of dollars to the right purchaser. At one meeting with potential investors in February 2005, Byce first formed the belief that Just did not view him as an equal in the corporation. (Byce, Jan. 16, 2007, at 1:36-40; Just, Jan. 17, 2007, at 1:38, 2:19; Byce, Jan. 19, 2007, at 11:56-12:01.)

In May 2005, Byce informed JustMed that the credit he was living on was starting to run out and that he needed some cash. JustMed agreed to pay half of Byce's salary in cash and the other half in shares. At this time, Byce filled out a W-4 form. Checks were issued to Byce for May, June and July 2005. Byce never cashed these checks. (Pla's Exs. 12, 13; Byce, Jan. 16, 2007, at 1:41-44; Just, Jan. 17, 2007, at 2:11, 4:06; Byce, Jan. 19, 2007, at 12:28.)

On June 13, 2005, Byce arrived at the JustMed offices in Oregon to work on the source code and test out the most recent version with George Barron, a laryngectomee who worked with the company. They were preparing for a meeting Just had scheduled with the President of ATOS on June 15 in Chicago as well as at least one trade show coming up in Boston. Byce also had planned on discussing equality within the company with Just. Prior to this visit, the last version of the source code that had been emailed from Byce to Just was in late April or early May 2005 and contained the version "B4." At the time of his visit, Byce had developed a "B5" version.

(Byce, Jan. 16, 2007, at 1:51-1:58; Byce, Jan. 17, 2007, at 9:52-54, 10:00-07; Just, Jan. 17, 2007, at 2:20-21; Byce, Jan. 19, 2007, at 11:19, 12:22-24.)

  Byce worked on the source code on his laptop in the JustMed offices late into the night of June 13.  He transferred the object code of this most recent version, "B5," onto the JustMed desktop.  While working on the JustMed computer, he came across a spreadsheet documenting the percentages of holdings for all the shareholders of JustMed.  A spreadsheet was produced at trial (Pla's Ex. 7) but Byce testified that although it had a similar look to it, it was not the exact document he saw that night.  Byce testified that the document he saw that night on the JustMed computer had a great disparity of ownership, with a 10 to 1 or 9 to 1 ratio of ownership between Just and himself and a 2 to 1 ratio of ownership between Jerry Liebler and himself.[5]  Upon seeing this document, Byce decided to delete from the JustMed desktop and laptop computers all the source code he had worked on, including all prior versions that he had sent to Just.  After deleting all the files he found, he went to the "trash bin" on the computer and emptied it.  Byce testified at trial he did this so Just could not "steal" the source code from him and that he was protecting himself as the designer and owner of the code.  He confirmed that the deletion could act as leverage in his negotiation with Just to achieve what he viewed as a more equitable ownership interest between Just and himself.  Additionally, Byce testified that he believed his actions in deleting the code would indirectly benefits the shareholders of JustMed.  (Byce, Jan. 16, 2007, at 1:59-2:26, 4:05-06; Just, Jan. 18, 2007, at 10:53-54; Byce, Jan. 19, 2007, at 11:18-22, 12:08, 12:21-24.)

  The following day, June 14, 2005, Byce and Just went to visit George Barron so he could

---

  [5]  Plaintiff's Exhibit 7 shows Just's holdings in JustMed, Inc. at 46%, Byce's holdings at 14% and Liebler's holdings at 24%.  (Pla's Ex. 7.)

test the JusTalk which contained the latest version of the software.  This demonstration did not

go well and they were unable to make the JusTalk work.  On the drive back to the JustMed

offices, Byce raised the topic of equality in terms of ownership, seniority and compensation

within the corporation.  Byce wanted to be equal, or close to equal, in terms of ownership with

Just.  To get more equality, Byce suggested that the number of outstanding shares be increased

and gifted to him or that Just transfer some of his shares directly to Byce.  In response, Just

informed Byce there were three ways to get shares in the company:  by exercising founders

options; by investing capital in the corporation; or by earning them as compensation for time

worked.  Just also informed Byce that if the potential merger or buy-out with ATOS did work

out, Byce would receive approximately $1 million for his ownership and efforts, to which Byce

responded that he needed $2 million in order to retire.  During this conversation that lasted

several hours, Byce never mentioned that he had deleted the source code from the JustMed

computers.  (Byce, Jan. 16, 2007, at 2:18-25; Byce, Jan. 17, 2007, at 9:32-42; Just, Jan. 17, 2007,

at 2:21-28.)

The next day, Just flew to Chicago for a meeting and demonstration of the JusTalk with

the President of ATOS.  Prior to the demonstration, he could not get the JusTalk to work.  He

tried reloading the object code from the JustMed laptop onto JusTalk device; however, that did

not solve the problem.  He then decided to recompile the source code into object code, which he

often did as a potential solution to a problem, and it was then that he realized he no longer had

the source code on his laptop.  Although it is the object code that is actually loaded onto the

JusTalk to make it work, Byce typically emailed the source code to Just, which Just would then

compile into object code to be loaded onto the JusTalk.  Just attended the meeting with the

President of ATOS although he was unable to demonstrate the product.  Afterwards, Just was on the telephone with Byce and Byce informed him that he had removed the source code for "revision control," essentially meaning that he had locked up that version of the code so that no one else could make changes to it.  When Just returned to Oregon, he discovered that Byce had deleted all the source code versions from the desktop computer as well.  Just testified that he thought Byce had done this to get more shares in the company.  Byce testified that he was not trying to sabotage the meeting with ATOS by deleting the source code and that he still wanted the company to be successful.  (Byce, Jan. 16, 2007, at 2:25-27; Byce, Jan. 17, 2007, at 9:43-50; Just, Jan. 17, 2007, at 2:30-36; Just, Jan. 18, 2007, at 10:54-57; Byce, Jan. 19, 2007, at 11:21-22.)

Once he realized all the code had been deleted from both computers, Just got in contact with a business associate, Ed Averill, who, using a variety of tools, helped him to recover several source code files that Byce had deleted, including versions A3, B1, B2 and B4.  (Just, Jan. 17, 2007, at 2:37-50; Pla's Exs. 16, 17, 18, 19.)  On August 9, 2005, JustMed filed this lawsuit in the Fourth Judicial District of the State of Idaho.  (Notice of Removal, Docket No. 1.)  On August 10, 2006, the state court issued a temporary restraining order (TRO) ordering Byce to turn over "a copy of all source codes, computer programs, readable files and other computer programming information ("Software") which he worked on and developed for JustMed, Inc.  Said copy shall be in full operating order."  (Pla's Ex. 21.)  On August 16, 2005, Byce's former counsel turned over to JustMed and its attorney an email with a B5 version of the source code attached.  Byce

testified that prior to doing so, he deleted some programmer's notes[6] from the code.  Byce also testified that since he did not save the versions of the code he had previously sent to Just, he could not turn over those exact versions.  Instead he turned over the latest version, B5, minus some programmer's notes.  (Pla's Ex. 22; Byce, Jan. 16, 2007, at 2:48-50, 3:55-4:00; Byce, Jan. 17, 2007, at 9:56-10:07.)

Just decided he could not trust the code turned over by Byce and contacted Jerry Liebler to help him work on and re-develop the code because JustMed was scheduled to attend upcoming trade shows and presentations.  Liebler and Just, starting with "Nice5d," worked approximately 100 hours a week for three months to come up with a new, functional version of the code.

Just testified that the salaries paid to him and Liebler, who was being paid a half salary, totaled $41,250.00 for this time period they worked on and re-created the code.  The new code was not ready by the time of the trade shows, instead Just had to attend these shows and explain to potential customers and business partners why they were unable to deliver the "new" software that had been promised in advertisements.  Just testified that negotiations with ATOS ended and one distributor backed out of selling JustMed products.  (Just, Jan. 17, 2007, at 3:06-27, 3:49-51; Liebler, Jan. 18, 2007, at 12:47-51.)

Subsequent to the deletion of the code, Byce was still in possession of some of JustMed's tangible property, including a few JusTalk units, headsets, handsets, chargers, among other

---

[6] Programmer's notes (or "comments") are notes the software programmer places in the code to describe what a particular line or section of code is there for, what its function is.  (Byce, Jan. 16, 2007, at 3:59; Byce, Jan. 17, 2007, at 9:57; Just, Jan. 17, 2007, at 3:14-15.)  Byce testified that programmer's notes are not part of the software because they have nothing to do with producing object code.  (Byce, Jan. 17, 2007, at 9:58.)  Just, Liebler and Averill all testified that programmer's notes (or comments) are considered part of the software.  (Just, Jan. 17, 2007, at 3:14-18; Averill, Jan. 18, 2007, at 11:34; Liebler, Jan. 18, 2007, at 12:43-44.)

**Memorandum Decision - Page 14**

items.  Just testified this property was valued at $5,028.00 and the company made several

attempts to get this property back, but it was never returned.  In late July 2005, Byce's former

counsel had indicated to JustMed and its counsel that these items would be returned.  At trial,

Byce's current counsel stated they were unaware of this statement by former counsel until just

prior to trial and had been holding onto these JusTalk units because they contained object code

worked on by Byce.  These items were tendered to JustMed on the third day of trial.  (Pla's Ex.

15; Just, Jan. 17, 2007, at 2:57-3:01, 3:26-27; Jan. 18, 2007, at 1:51-55.)

**III.**
**Conclusions of Law**

**A.      Defendant's Counterclaim for Declaratory Relief**

The Court will first address Byce's counterclaim for declaratory relief.  Byce seeks a

declaratory judgment under the Federal Copyright Act, 17 U.S.C. § 201, *et seq.*, that he is the

sole author and owner of the computer software at issue.  Byce alleges that he was an

independent contractor, not an employee, of JustMed and JustMed cannot be the owner of the

software since he never transferred title to it.

A copyright in a work "vests initially in the author or authors of the work."  17 U.S.C.

§ 201(a).  However, in the case of a "work made for hire, the employer or other person for whom

the work was prepared is considered the author....and, unless the parties have expressly agreed

otherwise in a written instrument signed by them, owns all of the rights comprised in the

copyright."  17 U.S.C. § 201(b).  A work made for hire is defined as "a work prepared by an

employee within the scope of his or her employment."  17 U.S.C. § 101.[7]

---

[7]  This section also sets forth several specific instances of "works made for hire" when they are specially
ordered or commissioned, none of which apply in this case.

**Memorandum Decision - Page 15**

The United States Supreme Court has delineated several factors under the general common law of agency to be analyzed in order to determine whether a person is an employee for purposes of the Federal Copyright Act of 1976.  *Community for Creative Non-Violence (CCNV) v. Reid*, 490 U.S. 730 (1989).  These factors include: the hiring party's right to control the manner and means by which the product is accomplished; the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.  *Id*. at 751-52.

The Court finds, based on these factors, that Byce was an employee of JustMed.  Although Byce worked out of his home and not in the JustMed offices, this was done as a matter of convenience as he lived in another state and neither party found it necessary for him to relocate.  This factor does not have much bearing on his status as an employee or independent contractor.

JustMed provided many tools and instrumentalities for Byce to use in working on the source code, including the previous source code, JusTalk units, chargers, cables, assemblers, and many other tools.  Byce did work on his own computer but JustMed had offered to provide him with a new one.  Byce communicated with Joel Just on a regular basis, via telephone or email, about his progress with the source code and informed him what steps he intended to take to improve it.  Byce would often email the source code to Just so he could test it out and see what

improvements needed to be made to the code's functionality.

Byce was not hired for a specific, limited period of time to complete one project. Instead, he was hired to work on the source code, among a few other various duties, with no end-date in sight. The source code could always be improved upon and as such, there was no definite end to Byce's work and employment. Although Byce's employment only lasted nine months, this was due to the dispute regarding ownership of the company, not the fact that Byce's work was completed. Additionally, Byce was not the first JustMed employee to design source code for the company. Prior to Byce, Jerry Liebler was employed by JustMed to design source code.

Computer programming is a skilled profession, but it is a profession within the scope of JustMed's regular business. The JusTalk device only functions because of the software compiled on it. In comparison, in *CCNV v. Reid*, the hired party was a sculptor which was clearly not within the hiring party's regular business, which was working to combat homelessness. *Id*. at 752. Byce also did other projects and work for JustMed beyond the computer programming. He worked on the company's website and attended tradeshows and demonstrations where he marketed and demonstrated the JusTalk device. At these events, Byce often distributed his JustMed business card which stated his title as "Director of Engineering."

Additionally, Byce was paid on a salaried basis, not in a lump sum dependent upon completion of a specific job as independent contractors are often paid. *See id.* Although Byce did not fill out a W-4 Form until he was paid in cash in the spring of 2005, and payroll and Social Security taxes were not paid until that time either, this was due more to the start-up and informal nature of the business rather than Byce being treated as an independent contractor.

Although there are a few factors in favor of finding that Byce may have been an

independent contractor, the majority of these factors weigh in favor of finding Byce to be an employee: he was paid a salary; his work was part of JustMed's regular business; he used JustMed tools and instruments in his work; he was not hired for a specific time period or project; he performed other jobs within JustMed; and he communicated and met with Just frequently to discuss the code and the JusTalk device in general as well as upcoming demonstrations and tradeshows.  Although Byce testified that he had complete control over the "manners and means" by which the code was created, he continually sent it to Just for evaluation.  Additionally, the Court finds Byce to be a less than credible witness.  During the trial, Byce repeatedly testified that he "didn't know" how much he was being paid and in what form he was being paid, that he "didn't read" emails sent to him, and "didn't look" at his percentage of ownership in JustMed on his K-1 form.  The Court finds that Byce's testimony that he was patently unaware of important aspects of his employment is not completely credible.

Based on the foregoing, the Court finds that Michael Byce was an employee of JustMed, Inc. and the source code he worked on while employed by JustMed was a "work made for hire" and accordingly ownership vests in JustMed, Inc. as the employer.  *See* 17 U.S.C. § 101, 201(b).

**B.**     **Misappropriation of a Trade Secret**

JustMed asserts that when Byce changed the copyright statement in the source code in the spring of 2005, deleted the source code from the JustMed computers in June 2005, and then filed the source code with his copyright application, he misappropriated a JustMed trade secret. The Idaho Trade Secrets Act provides for injunctive and monetary recovery for misappropriation.  I.C. §§ 48-802--803.  The Idaho Trade Secrets Act defines misappropriation as:

**Memorandum Decision - Page 18**

> (a) Acquisition of a trade secret of another by a person who knows
> or has reason to know that the trade secret was acquired by
> improper means; or (b) Disclosure or use of a trade secret of
> another without express or implied consent by a person who (A)
> Used improper means to acquire knowledge of the trade secret...

I.C. § 48-801(2).  Improper means includes "theft, bribery, misrepresentation, breach or

inducement of a breach of a duty to maintain secrecy..."  I.C. § 48-801(1).  A trade secret is

defined as "information, including a...computer program"[8] that "[d]erives independent economic

value, actual or potential, from not being generally known to, and not being readily ascertainable

by proper means by, other persons'" who could obtain economic value from its disclosure or use

*and* "[i]s the subject of efforts that are reasonable under the circumstances to maintain its

secrecy."  I.C. § 48-801(5).

The source code clearly falls within the definition of a trade secret as it had potential

economic value, being a new method that previously had not been used in the industry.  Further,

steps were taken to keep it secret, including never disclosing the code outside the company and

placing a copyright symbol within it.  It is also clear Byce "acquired" it.  The next question is

whether he acquired it through "improper means."  Byce deleted the source code from the

JustMed computers in the middle of the night on June 13-14, 2005.  He did not disclose to Just

that he had done so until Just discovered the fact himself.  When confronted by Just on the

telephone, Byce still did not tell Just the reasons for deleting the code, *i.e.*, to seek leverage over

Just, but stated he had done so for "revision control."  By deleting the company owned source

code off the company computers, it appears, at the very least, Byce breached a duty to maintain

---

[8]  A computer program is "information which is capable of causing a computer to perform logical
operations" and is "contained on any media or in any format," "capable of being input...into a computer" and has a
"prominently displayed copyright...either within or on the media containing information."  I.C. § 48-801(4).

**Memorandum Decision - Page 19**

the secrecy of the code.  Later, Byce disclosed this source code to the United States Copyright

Office when he applied for a copyright.  (Def's Ex. 254.)  Additionally, the Court would note that

when Byce did turn over the source code pursuant to the TRO, he deleted programmer's notes

from it.  Experienced computer programmers testified that they consider programmer's notes, or

comments, to be part of the code. (Just, Jan. 17, 2007, at 3:14-18; Averill[9], Jan. 18, 2007, at

11:34; Liebler, Jan. 18, 2007, at 12:43-44.)  The Court finds that the Defendant misappropriated

a trade secret as defined by I.C. § 48-801.

**C.      Conversion**

Plaintiff contends that Defendant committed the act of conversion with regards to the

source code and the JustMed property, such as JusTalk unit and other hardware., that were not

turned over until the third day of trial.  Conversion is defined as a "distinct act of dominion

wrongfully asserted over another's personal property in denial of or inconsistent with rights

therein."  *Peasley Transfer & Storage Co. v. Smith*, 132 Idaho 732, 743, 979 P.2d 605, 616

(1999).  The owner accrues a right of action as soon as the property is wrongfully taken from his

possession or wrongfully converted.  *Id*.  It is not necessary that an actor intend to commit

conversion in order to have a conversion claim.  *Id*.  An actor may even be liable where he was

unaware of the rights with which he interfered.  *Id*.  Additionally, a defendant's good or bad faith

intention, knowledge or mistake are immaterial.  *Id*.

It is not relevant that Byce thought he was the true owner of the source code at the time

he changed the copyright and deleted the source code from the JustMed computers.  The sole

---

[9]  During the trial, Defendant moved to strike the testimony of Ed Averill.  (Averill, Jan. 18, 2007, at 11:51; Jan 19, 2007, at 10:25.)  The basis of Defendant's objection dealt with the files that Mr. Averill compared in preparing his report.  As the Court has only referenced his testimony on one matter, programmer's notes, the Court does not find it necessary to strike his testimony.

**Memorandum Decision - Page 20**

relevant fact is that he asserted dominion and control over property of another.  Deleting software that a company owns from its computer is clearly inconsistent with its rights.  As to the JusTalk units that Byce's counsel retained possession over until the third day of trial for the purpose of preserving evidence, by holding onto these devices, regardless of his intent, Byce was acting inconsistent with JustMed's rights as owner.  As a good faith intention is not sufficient to defeat a claim for conversion, the Court finds that Byce is liable for conversion with regards to both the source code, which he initially took and only returned, absent programmer's notes, pursuant to the TRO, and the JusTalk units and other hardware retained by Byce until trial.

**D.      Breach of Fiduciary Duty**

Plaintiff asserts that Byce, as a director of JustMed, Inc., breached his fiduciary duty to the company when he changed the copyright on the source code from JustMed, Inc. to his name and deleted the source code from the company computers.  I.C. § 30-1-180 provides that each member of a board of directors, when discharging the duties of a director, shall act "in good faith, and in a manner the director reasonably believes to be in the best interests of the corporation."  Corporate directors are expected to exercise the utmost good faith in managing a corporation.  *Steelman v. Mallory*, 110 Idaho 510, 513, 716 P.2d 1282, 1285 (1986).  To establish a claim for breach of fiduciary duty, plaintiff must establish that defendants owed plaintiff a fiduciary duty and that it was breached.  *Tolley v. THI Co.*, 140 Idaho 253, 261, 92 P.3d 503, 511 (2004).  In a closely-held corporation, directors owe a fiduciary duty to one another, to the corporation and to the shareholders.  *McCann v. McCann*, 138 Idaho 228, 233, 61 P.3d 585, 590 (2002).

It is evident that Defendant, as a director, owed a duty to JustMed.  Although Byce

testified that he was acting in the best interests of the company when he deleted the source code because he was instituting "revision control" and he wanted the company to succeed as an investor, Byce also confirmed that he deleted the code to get leverage in negotiating for more shares in the company.  (Byce, Jan. 16, 2007, at 2:26.)  He also testified that when he deleted the code, he was protecting his interest.  (Byce, Jan. 16, 2007, at 2:10-15.)  Despite his testimony that he believed he was acting in the best interests of the company, the Court finds it is not reasonable to believe that deleting a major component of a product from a company computer prior to an important demonstration is in the company's best interests.  Byce deleted the code a day or two before Just flew to Chicago to demonstrate the product to ATOS, a potential investor and/or purchaser of the company.  Given his inconsistent testimony and the timing of the deletion of the code, Byce was not acting in good faith and with the best interests of JustMed in mind.  The Court finds that Defendant breached a fiduciary duty to JustMed, Inc. by not acting in the best interests of the corporation when he deleted the source code.

**E.      Tortious Interference with Prospective Economic Advantage**

Idaho recognizes the tort of interference with a prospective economic advantage. *Highland Enterprises, Inc. v. Barker*, 133 Idaho 330, 338, 986 P.2d 996, 1004 (1999).  The elements of this tort are:  (1) the existence of a valid economic expectancy; (2) knowledge of the expectancy on the part of the interferer; (3) intentional interference inducing termination of the expectancy; (4) the interference was wrongful by some measure beyond the fact of the interference itself (*i.e.*, that the defendant interfered for an improper purpose); and (5) resulting damage to the plaintiff whose expectancy has been disrupted.  *Id.*

The Court find that this claims fails on the first factor.  Although there were tradeshows

and meetings in the near future at the time Byce deleted the source code, there was nothing definite that came to light during trial that would demonstrate Plaintiff had a *valid* economic expectancy.  Plaintiff had hopes of economic expectancy including sales at the upcoming trade shows and a potential merger with ATOS, but these are too speculative.  Without evidence of a valid economic expectancy, the Court finds that this claim fails.

**F.     Damages**

Plaintiff seeks damages in the amount of $41,250.00.  The Idaho Trade Secrets Act provides that "[d]amages can include. . .the actual loss caused by misappropriation."  I.C. § 48-803(1).  The amount Plaintiff seeks for actual damages is the salary incurred by Just and Liebler in working for three months to create the new source code after Byce had deleted all the source code versions from the JustMed computers.  Although Byce turned over a B5 version of the source code pursuant to the TRO, he had deleted the programmer's notes, which are considered part of the code.  Had it not been for Byce's misappropriation, Just and Liebler would not have worked for three months to create a new, functional version of the source code.  The Court finds that JustMed suffered the actual loss of $41,250.00 caused by Defendant's misappropriation.

Plaintiff also seeks punitive damages pursuant to I.C. § 6-1604 and I.C. § 48-803(2).  I.C. § 6-1604(1) provides for punitive damages where plaintiff has proven, by clear and convincing evidence "oppressive, fraudulent, malicious or outrageous conduct" by the defendant.  It also provides that a punitive damages award shall not exceed "the greater of two hundred fifty thousand dollars ($250,000) or an amount which is three (3) times the compensatory damages contained in such judgment."  I.C. § 6-1604(3).  The Idaho Trade Secrets Act provides for "exemplary" damages when "willful and malicious misappropriation exists."  I.C. § 48-803(2).

This section also provides that the amount of exemplary damages cannot exceed the award made under § 48-803(1).

In May 2005, Defendant took it upon himself to change the copyright in the source code from "Copyright © JustMed, Inc. 2005" to "Copyright © Michael Byce 2005."  He never discussed this change with anyone else in the company.  In June 2005, Defendant deleted the source code from the JustMed computers in the middle of the night, only a few days before an important demonstration and meeting with a potential investor.  He never informed Just that he had done so.  When Just discovered the source code had been deleted, Defendant claimed he had deleted it for "revision control," something he had never done before.  After this lawsuit was filed and a TRO issued from the state court, Defendant deleted the programmer's notes from the source code before turning it over to Plaintiff.  The Court finds that these acts constitute "willful and malicious" appropriation and that punitive damages shall be awarded.  As the Court anticipates post-trial motions for attorneys fees and costs, it will defer ruling on the amount of punitive damages at this time.

Additionally, consistent with the Court's finding that JustMed is the owner of the source code at issue and pursuant to the Idaho Trade Secrets Act, I.C. § 48-802, the Court finds that JustMed is entitled to a permanent injunction against Byce that he cease and desist any use of the source code designated as Nice 5d and versions A1 through B5, or any derivative of the same, and that he shall delete any source code, other electronic files, or computer programs received from JustMed.

**IV.**
**Conclusion**

Based on the foregoing, the Court finds the weight of evidence supports a finding of liability by the Defendant on Plaintiff's claims of misappropriation of a trade secret (Count I), conversion (Count II), and breach of fiduciary duty (Count III).  Plaintiff's claim of tortious interference with a prospective economic advantage (Count IV) is dismissed.  Finally, the Court finds in favor of Plaintiff on Defendant's counterclaim for declaratory relief under the Federal Copyright Act, that claim is dismissed with prejudice.  JustMed is directed to submit a proposed judgment in conformity with the decision with ten (10) days, after submitting it to Defendant to review as to form and content.  The award of punitive damages will be included in a later amended judgment once any post-trial motions are addressed.

If no post-trial motions are filed within the time frames provided for in the Local Rules for the District of Idaho, the Court will enter an amended judgment setting forth the amount of punitive damages.

DATED: August 29, 2007

_____
Honorable Mikel H. Williams
Chief United States Magistrate Judge