Shelly C. Shannahan, ISB No. 5374
SShannahan@perkinscoie.com
Cynthia L. Yee-Wallace, ISB No. 6793
CYeeWallace@perkinscoie.com
PERKINS COIE LLP
1111 West Jefferson Street, Suite 500
P.O. Box 737
Boise, Idaho  83701-0737
Telephone: (208) 343-3434
Facsimile:  (208) 343-3232

William C. Rava, *Pro Hac Vice*
WRava@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue
Seattle, Washington 98101-3099
Telephone:  (206) 359-8000

*Attorneys for Michael Byce*


## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JUSTMED, INC., <br><br>      *Plaintiff/Counterdefendant,* <br><br>   v. <br><br> MICHAEL BYCE, <br><br>      *Defendant/Counterclaimant.* | Case No. CIV 05-333-S-MHW <br><br> **MOTION TO VACATE JUDGMENTS** |

     Defendant/Counterclaimant Michael Byce, by and through his counsel of record,

Perkins Coie LLP, hereby moves this Court, pursuant to Fed. R. Civ. P. 60, to execute the

Order, attached hereto as Exhibit 1, vacating the Judgment [87] filed on September 6, 2007

and the Amended Judgment and Permanent Injunction [118] filed on January 11, 2008, on the basis that the Judgments were reversed by the Ninth Circuit Court of Appeals' April 5, 2010 Opinion lodged with this Court on April 5, 2010 [128].  A true and correct copy of the April 5, 2010 Opinion is attached hereto as Exhibit 2.

DATED:  April 19, 2010.

PERKINS COIE LLP

By /s/Shelly C. Shannahan
    Shelly C. Shannahan, Of the Firm
    *Attorneys for Michael Byce*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she electronically filed the foregoing document with the Clerk of the court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Jed W. Manwaring
Judy L Geier

And, placing a copy in a postpaid envelope addressed to the person(s) hereinafter named, at the place(s) and address(es) stated below, which is/are the last known address(es), and by depositing said envelope and contents in the United States Mail at Boise, Idaho in accordance with the Rules of Procedure, to the following non-CM/ECF Registered Participant(s):

Addressee(s):

None

/s/Shelly C. Shannahan
Shelly C. Shannahan

**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

JUSTMED, INC.,

    *Plaintiff/Counterdefendant,*

  v.

MICHAEL BYCE,

    *Defendant/Counterclaimant.*

Case No. CIV 05-333-S-MHW

**ORDER VACATING JUDGMENTS**

This matter having come before the Court on Defendant/Counterclaimant Michael Byce's Motion to Vacate Judgments, Docket No. _____, and good cause appearing therefore,

IT IS HEREBY ORDERED and this does ORDER that the Judgment [87] entered on September 6, 2007, and the Amended Judgment and Permanent Injunction [118] entered on January 11, 2008, are vacated and reversed, pursuant to the Ninth Circuit Court of Appeals April 5, 2010 Opinion reversing said Judgments.

//

SUBMITTED BY:
Shelly C. Shannahan, ISB No. 5374
SShannahan@perkinscoie.com
PERKINS COIE LLP
1111 West Jefferson Street, Suite 500
P.O. Box 737
Boise, Idaho  83701-0737

**EXHIBIT 2**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JUSTMED, INC.,
*Plaintiff-counter-defendant-Appellee,*

v.

MICHAEL BYCE,
*Defendant-counter-claimant-Appellant.*

No. 07-35861

D.C. No.
CV-05-00333-S-MHW

OPINION

Appeal from the United States District Court
for the District of Idaho
Mikel H. Williams, Magistrate Judge, Presiding

Argued and Submitted
April 14, 2009—Seattle, Washington

Filed April 5, 2010

Before: Betty B. Fletcher, A. Wallace Tashima, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge B. Fletcher

## COUNSEL

Shelly H. Cozakos, Perkins Coie LLP, Boise, Idaho, for the defendant-appellant.

Jed W. Manwaring, Evans Keane LLP, Boise, Idaho, for the plaintiff-appellee.

## OPINION

B. FLETCHER, Circuit Judge:

At the heart of this case is a dispute over whether a small technology start-up company owns the source code developed

for its product. Its informal employment practices raise questions as to whether defendant-appellant Michael Byce was an employee when he developed the source code. After a bench trial, the district court entered judgment and ordered a permanent injunction against Byce, in favor of plaintiff-appellee JustMed, Inc., Byce's former employer. Among other things, the district court found that JustMed owns the software program used on its digital audio larynx device under the work-for-hire doctrine of the Federal Copyright Act, because Byce wrote the source code for the company as an employee, not as an independent contractor. The district court also found that Byce misappropriated the software under the Idaho Trade Secrets Act. Byce appeals both rulings. We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part and reverse in part.

# I

Joel Just and Michael Byce are former brothers-in-law who together developed the idea of a digital audio larynx, a device to help laryngectomees—individuals whose larynxes have been surgically removed—produce clearer speech. Both have degrees in electrical engineering and experience working in the computer industry. Initially, the two began discussing the idea in 1994 on a family vacation. Just and Byce brainstormed ideas for how to advance such devices—in particular how to produce a hands-free device, rather than one that required the user to hold the device against the throat—and, in 1995, they applied for a patent as co-inventors of a "system and method for monitoring the oral and nasal cavity," which was issued to them in 1998.

Byce worked on the project between 1995 and 1998, but no one did any further work on the device from 1999—when Byce's wife, the sister of Just's wife Ann, unexpectedly died —until 2003. Then, in 2003, Joel and Ann Just formed Just-Med, Inc., based in Beaverton, Oregon, to continue development of the product. Just recruited a former business

Case 1:07-cv-00354-BLW   Document 123   Filed 04/25/07   Page 4 of 234-1

associate, Jerome Liebler, to help work on the idea. He offered founders' options to Byce, and Byce ultimately invested $25,000 in return for 130,000 shares. Byce also accepted a position on JustMed's board of directors, serving with the Justs.

Just and Liebler worked full time developing a new hardware prototype and writing source code for the product.[1] Liebler wrote a majority of the code, working at his home on his own computers. The code was never released outside of the company, and notices on the code stated that it was copyrighted by JustMed, although the code was not registered with the United States Copyright Office.

Since it was not yet producing a product, the company operated financially by selling shares to family members and by relying on loans from the Justs. Just and Liebler did not receive a cash salary and instead were compensated with shares of stock.

By the summer of 2004, JustMed had a marketable product called "JusTalk." Liebler, however, moved to Kentucky, making it difficult for him to continue his work on the product. At the same time, Byce expressed interest in becoming more involved with the company. Liebler was still drawing half of his salary, but agreed to have the whole package—at that point, $90,000 per year, paid as 15,000 shares per month, each share valued at 50 cents—transferred to Byce and to have Byce take over development of the source code.

At trial, Just testified that Byce was hired as an employee to replace Liebler, who was also an employee, and that Byce agreed to be paid a salary in shares of stock. Byce, on the

---

[1]Source code is code written in a programming language that is readable by humans. Object code is produced by rendering those same programming instructions in a binary form that the computer can read, a process known as compiling.

other hand, testified that while he expected to be adequately compensated in shares upon transferring ownership of the source code, he never understood himself to be an employee and had no "explicit knowledge" that he was accruing shares as compensation.

JustMed and Byce had no written employment agreement. Byce never filled out an I-9 employment verification form or, until 2005, a W-4 tax withholding form. At most, Just documented Byce's salary and duties in a notebook that he kept, although the notation indicating when Byce started was not recorded until several months after Byce began working on the source code. Although Byce began full-time work on the source code in September 2004 and began accruing JustMed stock in October, he never received share certificates for the stock he received as compensation. Indeed, the company generally did not keep formal records other than a series of notebooks Just maintained to track conversations and events. While Byce worked for JustMed, the company did not issue Byce a W-2 wage statement form, withhold taxes, or pay workers' compensation or unemployment insurance. Nor did the company provide benefits for Byce or report his employment to the state. Just testified that he did not think much of this was necessary because he thought of Byce as a JustMed "executive," and because JustMed was modeled on prior start-up technology businesses that Just had been involved with, where employees were paid exclusively in stock and the stock was never reported as income because of its uncertain value.

Although Byce was carrying on Liebler's duties, Byce operated differently, because he did not live and work in Oregon as Liebler had. Instead, Byce worked from his home in Boise, Idaho, using his own computer. Just provided Byce with the original code created by Liebler and various materials necessary to Byce's development work, including JusTalk units, schematics, data sheets, batteries, chargers, assemblers, source code, and headsets. Byce set his own hours, often working late into the night, and Just did not tell him how to

spend his days. As Byce developed new versions of the source code, he would e-mail the new version to Just, who would compile it and load it onto the JusTalk to evaluate its performance. Whereas Just had previously worked side-by-side with Liebler, Just and Byce often communicated by phone or e-mail, and occasionally would meet in Boise or Portland or somewhere in between. The two exchanged ideas and discussed the functionality of the code, as well as improvements that needed to be made. Just, admittedly a poor programmer, never made changes to the source code, and by the time this dispute arose, Byce had substantially rewritten the source code Liebler had developed. According to Byce, only 21 lines of code from the last version Liebler worked on remained, out of approximately 3500 to 4000 lines total.

While he was working on the source code, Byce was included in the company profile brochure and had a JustMed business card. He was alternatively referred to as the "Director of Research and Development" and the "Director of Engineering," the latter title supplied by Byce himself. Although he was primarily working on the source code, Byce also updated the company Web site and attended conferences, marketing meetings, and demonstrations on behalf of Just-Med.

Because he was not earning money, Byce was living on credit, and by May 2005 he was worried about his financial situation. He told Just that he would soon need cash. In response, Just agreed to have JustMed pay Byce half in cash and half in shares. Byce filled out a W-4 form, and the company issued three checks for him as payment for May, June, and July 2005.

Byce, however, never cashed the checks. At this point, Byce became concerned that Just did not view him as an equal in the corporation. In order to protect what he perceived as his intellectual property, Byce changed the copyright state-

ment on the software, so that it now read "Copyright (c) Mike Byce 2005" instead of copyright JustMed.

Then, while Byce was working in the Oregon office two days before Just was scheduled to meet with a potential merger or buy-out partner, Byce deleted all copies of the source code from JustMed's computers. Byce testified that he made the decision after seeing a spreadsheet showing a large disparity between the number of shares Byce owned and those shares that the Justs and Liebler owned. In its memorandum decision, the district court found that Byce deleted the code to gain leverage over Just in Byce's efforts to acquire a greater share of the company. The next day, Byce raised with Just the disparity in ownership between Byce and the other primary shareholders. The two talked for several hours, but Just declined to give additional shares to Byce. During this conversation, Byce did not mention that he had deleted the source code from JustMed's computers.

Just still had a recent version of the object code loaded on a JusTalk unit, but after flying to Chicago for his demonstration meeting, Just could not get the unit to work. Hoping this was a curable problem, Just tried to recompile the source code on his laptop and then load it onto the unit, only to discover that he no longer had a copy of the source code. Just called Byce about the missing code, but Byce claimed to have assumed "revision control," meaning that he had removed the source code to insure that no one else would make changes to it.

Only upon returning to Oregon did Just realize that Byce had deleted the source code from all of JustMed's computers. Just was able to recover some prior versions of the source code files, but not the most recent one. Byce later returned the latest version of the source code, with some of the programmer's notes removed, but only after JustMed filed suit against Byce and the Idaho state court issued a temporary restraining

order.[2] Because Just did not trust the code he received from Byce, JustMed has since worked from older versions of the code to develop the device.

JustMed filed suit in state court, and Byce removed the case to federal court, asserting that it required determination of ownership of the software under the Copyright Act. The district court denied JustMed's motion to remand after it decided that the case required application of federal copyright law, in particular, the work-for-hire doctrine. Byce later counterclaimed, seeking a judgment declaring that he is the sole author and owner of the software under the Copyright Act. JustMed asserted only state law claims, including misappropriation of a trade secret, conversion, breach of fiduciary duty, and intentional interference with a prospective economic advantage.

After a bench trial, the district court found in favor of JustMed and held that Byce was an employee when he wrote the software, so that JustMed owned the copyright to the software. The court also found Byce liable for misappropriation of a trade secret, conversion, and breach of his fiduciary duty. This timely appeal followed.

## II

[1] Although neither party raised jurisdictional concerns, we must satisfy ourselves that we have jurisdiction over this case. The district court asserted it had jurisdiction under 28 U.S.C. § 1338. In its denial of JustMed's motion to remand, the district court ruled that JustMed's claims required con-

---

[2]Programmer's notes or comments are annotations within the source code that comment on the source code and try to make it easier to understand. While such comments are typically ignored by the compiler or interpreter when compiling source code because they do not affect the operation of the object code, several of JustMed's witnesses testified that they considered the comments part of the software.

struction of the Copyright Act and therefore fell under the
second prong of the test articulated in *T.B. Harms Co. v.
Eliscu*, 339 F.2d 823, 828 (2d Cir. 1964), for determining
when an action "arises under" the Copyright Act. This court
has adopted the Second Circuit's test in *T.B. Harms. See, e.g.,
Scholastic Entm't, Inc. v. Fox Entm't Group, Inc.*, 336 F.3d
982, 986 (9th Cir. 2003); *Topolos v. Caldewey*, 698 F.2d 991,
993 (9th Cir. 1983).

Under *T.B. Harms*,

> an action "arises under" the Copyright Act if and
> only if the complaint is for a remedy expressly
> granted by the Act, e.g., a suit for infringement or for
> the statutory royalties for record reproduction, 17
> U.S.C. § 101, or asserts a claim requiring construc-
> tion of the Act . . . or, at the very least and perhaps
> more doubtfully, presents a case where a distinctive
> policy of the Act requires that federal principles con-
> trol the disposition of the claim. 339 F.2d at 828
> (citation omitted).

"In summary, the *T.B. Harms* test requires the district court
to exercise jurisdiction if: (1) the complaint asks for a remedy
expressly granted by the Copyright Act; (2) the complaint
requires an interpretation of the Copyright Act; or (3) federal
principles should control the claims." *Scholastic Entm't, Inc.*,
336 F.3d at 986. "The test outlined in *T.B. Harms* is essen-
tially a reiteration of the 'well-pleaded complaint' rule that
federal jurisdiction exists only when a federal question is
presented on the face of a properly pleaded complaint." *Id.*;
*see also Nimmer on Copyright* § 12.01[A][1][d][1]. However,
the well-pleaded complaint rule has a necessary corollary—
the artful pleading doctrine. "[U]nder the artful pleading rule
'a plaintiff may not defeat removal by omitting to plead nec-
essary federal questions in a complaint.' " *ARCO Envtl.
Remediation, L.L.C. v. Dept. of Health & Envtl. Quality of the
State of Mont.*, 213 F.3d 1108, 1114 (9th Cir. 2000) (quoting

*Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 22 (1983)); *see also Nimmer*, § 12.01[A][1][d][I] ("[A] plaintiff may not defeat federal court jurisdiction through the simple expedient of artfully pleading around necessary federal questions.").

[2] The owner of a copyright has several exclusive rights under the Copyright Act, the most relevant being the rights to reproduce the work, create derivative works, and distribute the work. 17 U.S.C. § 106(1)-(3). Although a complaint may not state a Copyright Act claim on its face, federal jurisdiction may be appropriate if resolution requires application of the work-for-hire doctrine of the Copyright Act, which the Supreme Court examined in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) (*CCNV*). That case involved an ownership dispute between an artist hired to produce a sculpture and the organization that hired him. *CCNV*, 490 U.S. at 733. The Supreme Court determined it had to "construe the 'work made for hire' provisions of the Copyright Act," *id.* at 732, noting that "[t]he contours of the work for hire doctrine . . . carry profound significance for freelance creators—including artists, writers, photographers, designers, composers, and computer programmers—and for the publishing, advertising, music, and other industries which commission their works." *Id.* at 737. In this context, the Court reasoned that "[e]stablishment of a federal rule of agency, rather than reliance on state agency law, is particularly appropriate here given the Act's express objective of creating national, uniform copyright law by broadly pre-empting state statutory and common-law copyright regulation." *Id.* at 740 (citing 17 U.S.C. § 301(a)). "This practice reflects the fact that 'federal statutes are generally intended to have uniform nationwide application.' " *Id.* at 740 (quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989)).

[3] In this case, the complaint asserts JustMed's ownership of the source code, while at the same time acknowledging that ownership is disputed. These allegations directly implicate the

Copyright Act. JustMed was required to prove it owns the source code to prevail on its trade secret and conversion claims, but the ownership rights under the Copyright Act overlap with those constituting common law ownership. Because ownership normally vests in the author of a work, JustMed would have ownership only under the Copyright Act's work-for-hire doctrine because there was no written agreement as to ownership. Thus, application of the work-for-hire doctrine is central to this appeal. The instant case, therefore, arises under the federal law governing copyrights. *See Scandinavian Satellite Sys., AS v. Prime TV Ltd.*, 291 F.3d 839, 845 (D.C. Cir. 2002) ("[A] dispute that turns on whether a copyrighted work was created independently or as a 'work made for hire' is an *ownership dispute* that unquestionably arises under the Copyright Act." (citing *CCNV*, 490 U.S. 730)). We conclude that the district court correctly retained jurisdiction over the case and that we have jurisdiction over the appeal.

## III

Having satisfied the jurisdictional inquiry, we now turn to the merits. We review de novo the district court's conclusions of law following the bench trial, including its determination that the source code was a work made for hire and its interpretation of state law. *See Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 879 (9th Cir. 2005); *Paulson v. City of San Diego*, 294 F.3d 1124, 1128 (9th Cir. 2002) (en banc). We review the district court's factual findings for clear error. *See Twentieth Century Fox*, 429 F.3d at 879.

## A

[4] Under the Copyright Act of 1976, copyright ownership "vests initially in the author or authors of the work."[3] 17

---

[3]Computer software, including the source and object codes, can be subject to copyright protection. *See Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*, 886 F.2d 1173, 1175 (9th Cir. 1989).

U.S.C. § 201(a). An exception exists, however, for "works made for hire," in which case "the employer or other person for whom the work was prepared is considered the author" and owns the copyright, unless there is a written agreement to the contrary. *Id.* § 201(b). As it is relevant here, a "work made for hire" is "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101. Thus, whether Byce owns the source code copyright turns on whether he was an employee of JustMed or an independent contractor.[4]

[5] The Supreme Court has explained that absent any textual indications to the contrary, when Congress uses the terms "employee," "employer," or "scope of employment," it means to incorporate principles from the general common law of agency. *CCNV*, 490 U.S. at 740-41. Accordingly, "the hiring party's right to control the manner and means by which the product is accomplished" is the central inquiry here. *Id.* at 751. Factors relevant to this inquiry include: the skill required for that occupation, the source of the instrumentalities and tools, the location of the work, the duration of the relationship between the parties, whether the hiring party has the right to assign additional projects to the hired party, the extent of the hired party's discretion over when and how long to work, the method of payment, the hired party's role in hiring and paying assistants, whether the work is part of the regular business of the hiring party, whether the hiring party is in business, the provision of employee benefits, and the tax treatment of the hired party. *Id.* at 751-52 (citing Restatement (Second) of Agency § 220(2) (1958)). Because "the common-law test contains no shorthand formula or magic phrase that can be applied to find the answer, all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324 (1992) (quoting *NLRB v. United Ins. Co. of Am.*, 390 U.S.

---

[4]The parties do not appear to dispute that if Byce was an employee, he was acting within the scope of his employment when he wrote the source code.

254, 258 (1968)) (quotation marks and alteration omitted); *see also Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992) ("It does not necessarily follow that because no one factor is dispositive all factors are equally important, or indeed that all factors will have relevance in every case. The factors should not merely be tallied but should be weighed according to their significance in the case.").

Byce argues on appeal that the district court improperly weighed the factors and ignored crucial facts, especially Just-Med's tax treatment of Byce, the failure to provide him with benefits, the failure to fill out appropriate employment forms, the lack of any written agreement regarding Byce's employment or salary, and the lack of stock certificates for shares Byce was accruing.

However, taking the various factors into account, we conclude that the district court did not err in finding that Byce was an employee. In particular, the contemplated duration of the relationship, the tasks Byce did for JustMed, the fact that Byce earned a salary from JustMed, and the nature of Just-Med's business all support the finding that Byce was an employee. While no one factor is decisive, we draw some guidance in weighing the factors from JustMed's status as a technology start-up company. The evidence of the way Just-Med operates gives support to the finding that Byce was an employee. Admittedly, some of the factors that Byce points to support his position, but mostly they are entitled to little weight when viewed in light of the way JustMed conducts its business.

[6] JustMed hired Byce primarily to work on the JusTalk software, but he was not hired for a specific term or with a discretely defined end product in mind. *Cf. CCNV*, 490 U.S. at 753 (independent contractor hired for single task of producing sculpture). JustMed continuously worked on the source code to improve its effectiveness and capability. Although Byce's work on the source code lasted only nine months, it

was halted not because the code's development had reached
a logical termination point but because of the parties' dispute.
Thus, the fact that the parties contemplated a relationship of
indefinite duration cuts in favor of finding Byce an employee.

[7] Byce did other work for JustMed as well. He updated
the company's Web site and demonstrated the JusTalk units
at tradeshows. Byce had previously worked on the Web site
when he acted only as a director and shareholder for the com-
pany, but his continued work on tasks besides programming
indicates JustMed could have assigned additional projects to
Byce. Moreover, his formal title indicates that he had broad
duties within JustMed, as well as a relationship with the com-
pany that was intended to be permanent.

[8] JustMed hired Byce to replace Liebler, an employee,
and paid him the same salary that Liebler received.[5] At trial
Byce disputed that there was any agreement as to how he
would be paid, and Byce continues to argue that the lack of
a written agreement regarding salary and the lack of stock cer-
tificates undermine the salience of this factor. But the district
court did not find credible Byce's inability to recall what he
was being paid and how. Although independent contractors
are often paid upon completion of a specific job, *see CCNV*,

---

[5]While an employer's designation of a person as an employee or inde-
pendent contractor is not always relevant because employers often have an
incentive to designate an individual as one or the other, *see, e.g.*, *Vizcaino
v. Microsoft Corp.*, 97 F.3d 1187, 1189 (9th Cir. 1996) ("Large corpora-
tions have increasingly adopted the practice of hiring temporary employ-
ees or independent contractors as a means of avoiding payment of
employee benefits, and thereby increasing their profits."), *aff'd en banc*,
120 F.3d 1006 (9th Cir. 1997), both Liebler and JustMed believed they
had an employee-employer relationship. *See* Restatement (Second) of
Agency § 220(2)(I) (listing parties' subjective conceptions of the relation-
ship as one factor in master-servant determination). This fact cuts in favor
of similarly finding Byce an employee, as he essentially stepped into Lie-
bler's role. That Byce replaced Liebler also indicates that the JusTalk soft-
ware was an ongoing concern for the company, not a discrete project that
JustMed expected Byce to simply finish and be done with.

490 U.S. at 753 (independent contractor was to be paid upon completion of sculpture), Byce was paid a regular monthly salary in the same way as other JustMed employees. This weighs heavily in favor of finding him an employee, even though much of the salary came in the form of stock.

[9] Also militating in favor of JustMed is the fact that its primary business was the development and marketing of the JusTalk device. Byce's work was integral to JustMed's regular business, since the JusTalk cannot work without functioning software. *Cf. Aymes*, 980 F.2d at 863 (finding programming work for swimming pool company not part of the firm's regular business but stating that "work done by a computer programmer employed by a computer software firm would be done in the firm's regular business"). Indeed, there is evidence that JustMed tried to sell consumers on the JusTalk precisely by emphasizing that the software could constantly be updated. It seems highly unlikely that JustMed would leave such an important, continuous responsibility to an independent contractor who would terminate his relationship with the company upon completing a working version of the software.

While some factors initially seem to favor Byce, on closer examination they are insufficient to find him an independent contractor.[6]

It is true, for example, that Just did not exercise much control over the manner and means by which Byce created the source code. However, this is not as important to a technology start-up as it might be to an established company. Byce was an inventive computer programmer expected to work independently.[7] The business model and Byce's duties do not require

---

[6] Some of the factors also are inconclusive. For example, Byce was unlikely to need additional help, so it is not relevant who might pay for this hypothetical extra help.

[7] In this regard, see Restatement (Second) of Agency § 220, comment e, which explains that "[t]he custom of the community as to the control ordinarily exercised in a particular occupation is of importance."

that the project be completed in a particular manner or that Just continuously oversee Byce's work, so long as JustMed eventually found itself with a marketable product. Moreover, Just did have some input into Byce's work on the software, even if it was given by e-mail and phone. Cf. id. at 862 (input from client regarding computer program's functions "weighs heavily in favor of finding [programmer] . . . an employee"); but see CCNV, 490 U.S. at 572 ("[T]he extent of control the hiring party exercises over the details of the product is not dispositive.").

The nature of the business and the work similarly means that Byce's ability to set his own hours and the fact that he worked from home are not particularly relevant. As a programmer, Byce could, in essence, ply his craft at any time and from any place without significant impairment to its quality or his ability to meet JustMed's needs. So although physical separation between the hiring party and the worker is often relevant to determining employment status, it is less germane in light of the kind of work Byce was doing. Of course, computer programming is a skilled profession, which weighs in favor of finding Byce not an employee, but given the other factors and the fact that JustMed's regular business requires it to employ programmers, we find this far from conclusive.

[10] Byce's strongest argument turns on JustMed's failure to pay benefits and fill out the appropriate employment forms, and JustMed's tax treatment of Byce. Some courts have relied heavily on these factors as "highly probative of the true nature of the employment relationship." See Aymes, 980 F.2d at 861, 863-64 ("[E]very case since [CCNV] that has applied the test has found the hired party to be an independent contractor where the hiring party failed to extend benefits or pay social security taxes."); see also Kirk v. Harter, 188 F.3d 1005, 1009 (8th Cir. 1999) (agreeing with Aymes that employee benefits and tax treatment are especially significant to determination of employee status). There is a danger, however, in relying on them too heavily, because they do not bear directly on the

substance of the employment relationship—the right to control. In this case, the factors do not decisively favor Byce, especially when one considers JustMed's business model.

We note Byce did eventually fill out a W-4 form and have taxes withheld once he started receiving paychecks from Just-Med. The tax treatment here is therefore more ambiguous than in other copyright cases where courts have relied on the hiring party's treatment of the hired party as an independent contractor—for example, by not withholding taxes and by giving the hired party 1099 forms—and only later asserted that the individual was an employee. *See Aymes*, 980 F.2d at 859; *Kirk*, 188 F.3d at 1009. While an inherent unfairness exists in a company claiming a worker to be an independent contractor in one context but an employee in another, *see Aymes*, 980 F.2d at 859, that is not the case here.

[11] JustMed's treatment of Byce with regard to taxes, benefits, and employment forms is more likely attributable to the start-up nature of the business than to Byce's alleged status as an independent contractor. The indications are that other employees, for example Liebler, were treated similarly. Insofar as JustMed did not comply with federal and state employment or tax laws, we do not excuse its actions, but in this context the remedy for these failings lies not with denying the firm its intellectual property but with enforcing the relevant laws.

[12] As a small start-up company, JustMed conducted its business more informally than an established enterprise might. This fact can make it more difficult to decide whether a hired party is an employee or an independent contractor, but it should not make the company more susceptible to losing control over software integral to its product. Weighing the common law factors in light of the circumstances and Just-Med's business, we conclude that the district court did not err in holding that Byce was an employee and that the source code was a work made for hire.

## B

[13] We next consider JustMed's misappropriation claim. Idaho has adopted a slightly modified version of the Uniform Trade Secrets Act (UTSA). *See* Idaho Code Ann. §§ 48-801 to -807. Significant for our purposes, Idaho explicitly includes a definition of "computer program" as a protectable trade secret. *See* UTSA (amended 1985) § 1, Action in Adopting Jurisdictions (Idaho), 14 U.L.A. 540 (2005); Idaho Code Ann. § 48-801(4), (5). The Idaho Trade Secrets Act (ITSA) provides for damages or injunctive relief if a plaintiff's trade secret is misappropriated by another. Idaho Code Ann. §§ 48-802, 48-803. The Act defines misappropriation as:

> (a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> (A) Used improper means to acquire knowledge of the trade secret; or
>>
>> (B) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
>>
>>> (i) Derived from or through a person who had utilized improper means to acquire it;
>>>
>>> (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>>
>>> (iii) Derived from or through a person who owed a duty to the person seeking

> relief or maintain its secrecy or limit its
> use; or
>
> (C) Before a material change of his posi-
> tion, knew or had reason to know that it
> was a trade secret and that knowledge of it
> had been acquired by accident or mistake.

*Id.* § 48-801(2).

The term "trade secret" "means information, including a
formula, pattern, compilation, program, computer program,
device, method, technique, or process" that "[d]erives inde-
pendent economic value . . . from not being generally known
to, and not being readily ascertainable by proper means by,
other persons who can obtain economic value from its disclo-
sure or use" and "[i]s the subject of efforts that are reasonable
under the circumstances to maintain its secrecy." *Id.* § 48-
801(5). Improper means, in turn, "include theft, bribery, mis-
representation, breach or inducement of a breach of a duty to
maintain secrecy, or espionage through electronic or other
means." *Id.* § 48-801(1).

**[14]** It is undisputed that the source code, as a whole, is a
trade secret. The district court found Byce liable for misap-
propriation, although under which definition of misappropria-
tion it found liability is unclear. We first examine Byce's
acquisition of the source code.

**[15]** We find that Byce did not "acquire" the source code
through improper means because he already had possession of
it as an employee.[8] Acquire means "to come into possession,

---

[8]Byce did act improperly when he changed the copyright notice on the
code to reflect his ownership rather than JustMed's, deleted all other cop-
ies of the code, and failed to turn over a complete copy of the code when
required to do so. However, these actions amounted to improper retention,
not improper acquisition. For the same reason, Byce did not breach his
duty of confidentiality in acquiring the source code.

control, or power of disposal of." Webster's Third New Int'l Dictionary 18 (3d ed. 1993). Byce already had possession of the source code through his work for JustMed. Indeed, he created much of it. In that capacity, however, he did acquire it "under circumstances giving rise to a duty to maintain its secrecy or limit its use." Idaho Code Ann. § 48-801(2)(b)(B)(ii). Thus, if Byce used or disclosed the trade secret, he is liable for misappropriation. *Id.* § 48-801(2)(b).

[16] Although Byce disclosed a portion of the source code to the Copyright Office, the district court did not decide whether this portion of the code alone had the necessary economic value to be a trade secret. Moreover, disclosure of a portion of the source code to the Copyright Office, in itself, is not necessarily inconsistent with maintaining the secrecy and value of the trade secret. *See Compuware Corp. v. Serena Software Int'l, Inc.*, 77 F. Supp. 2d 816, 821-22, 823 n.18, 825 n.24 (E.D. Mich. 1999) (holding that computer software maintained status as protected trade secret, under Michigan law, even after a copy was deposited with Copyright Office in connection with a copyright application). Not only did Byce submit only a portion of the code, but also "[i]t is the general policy of the Copyright Office to deny direct public access to in-process files and to any work (or other) areas where they are kept" and thereafter the office releases reproductions of works under limited circumstances only. *See* 37 C.F.R. § 201.2. Thus, the district court's findings on disclosure are insufficient to hold Byce liable for misappropriation under a disclosure theory.

[17] Beyond the disclosure of several pages to the Copyright Office, JustMed has not alleged that Byce otherwise disclosed the code. Therefore, we examine Byce's "use" of the source code as an independent basis of liability. Restatement (Third) of Unfair Competition § 40 (1995) (Appropriation of Trade Secrets) discusses the scope of use:

> There are no technical limitations on the nature of the conduct that constitutes "use" of a trade secret

> for purposes of the rules stated in Subsection (b). As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use" under this Section. Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret all constitute "use."

Restatement (Third) of Unfair Competition § 40, cmt. c (1995) (citation omitted). The term "use" in the context of misappropriation of a trade secret generally contemplates some type of use that reduces the value of the trade secret to the trade secret owner. *See* 1 Trade Secrets Law § 3:20 ("The primary interest of the plaintiff in trade secret cases is the preservation of the exclusive rights to, and the continued secrecy of, the appropriated information . . . . In some cases, such as where the trade secret has not been disclosed or used, an injunction may be the only appropriate remedy."); *see also Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1325 (5th Cir. 1994) (the purpose of the trade secrets statute is to prevent someone from profiting from another's trade secret, thus acquiring a free competitive advantage); *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974) ("The defendant must have actually put the trade secret to some commercial use. The law governing protection of trade secrets essentially is designed to regulate unfair business competition, and is not a substitute for criminal laws against theft or other civil remedies for conversion."). "[T]o sustain a trade secrets action under the 'use' prong of the statutory definition of 'misappropriation,' a plaintiff must necessarily demonstrate that the defendant received some sort of unfair trade advantage." *Omnitech Int'l, Inc.*, 11 F.3d at 1325 (interpreting Louisiana's misappropriation statute, which requires "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of *disclo-*

*sure or use*, knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." (citing La. Rev. Stat. Ann. § 51:1431(2)(b)(ii)(bb))).

[18] Besides filing for a copyright and threatening to withhold the source code, Byce made no other "use" of the source code. Rather, Byce obtained leverage over negotiations with JustMed by deleting all copies of the source code from JustMed's computers, giving Byce exclusive possession. While Byce threatened misappropriation, his actions did not rise to the level of misappropriation. Indeed, had Byce misappropriated the source code such that he diminished its value or secrecy, he would have lost his leverage over JustMed and also hurt his own bargaining position.

[19] That Byce did not use the source code is evident from the damages analysis. *See* Restatement (Third) of Unfair Competition § 40, cmt. c ("The nature of the unauthorized use, however, is relevant in determining appropriate relief."). In Idaho, typically, the court will "construe 'actual loss' to mean lost profits, lost customers, lost market share, and similar losses." *GME, Inc. v. Carter*, 917 P.2d 754, 756 (Idaho 1996). The district court awarded JustMed damages of $41,250.00, which covered the salary for Just and Liebler for the three months they spent recreating the source code after Byce had deleted all versions of the source code from the JustMed computers. These damages, however, do not reflect damages from Byce's use, as opposed to his mere possession, of the source code. Byce returned the source code to JustMed after the court ordered him to do so. His possession of the source code for some period of time did not result in a loss of secrecy or a loss in value, which is evident from the fact that the court did not award damages for lost value or unjust enrichment. Thus, not only are damages not appropriate under Idaho law, but neither is a finding that Byce misappropriated the source code.

[20] Nothing here brings Byce's inappropriate conduct beyond the realm of simple conversion into that of misappropriation of a trade secret. Thus, we reverse the district court's finding that Byce misappropriated the source code under the ITSA.

[21] Nonetheless, under Idaho law, "[a]ctual or threatened misappropriation may be enjoined." Idaho Code Ann. § 48-802. Therefore, while damages for misappropriation of a trade secret are inappropriate here because of the lack of "use" or "disclosure" as contemplated in the context of trade secret protection, the district court may grant an injunction against Byce's threatened use or disclosure of the source code if appropriate. We remand to the district court to allow it to make this determination in the first instance. In addition, while damages are not appropriate under the ITSA, we remand to the district court to determine whether JustMed can recover damages under either the conversion or breach of fiduciary duty claims.

## Conclusion

For the foregoing reasons, we agree with the district court that Byce was an employee of JustMed at the time he wrote the JusTalk source code, and that JustMed owns the software. We reverse the district court's determination that Byce misappropriated the source code and the award of damages under the ITSA. We remand the case for the district court to determine whether and in what amount JustMed can recover damages on the conversion or breach of fiduciary duty claims and whether an injunction to prevent future misappropriation is warranted. Each party shall bear its or his own costs on appeal.

**AFFIRMED in part, REVERSED in part, REMANDED.**